**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**
_____

W.K. on behalf of his minor child, A.K.,

      Plaintiff,

    v.                             No.  15-cv-00416-WJ-GBW

ALBUQUERQUE POLICE DEPARTMENT
DETECTIVE DANIEL HOWIE, in his individual capacity;
ALBUQUERQUE POLICE DEPARTMENT DETECTIVE
PATRICIA ST. ONGE, in her individual capacity,

      Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court upon a Motion for Summary Judgment Based on Qualified Immunity, filed on October 16, 2015 by Defendants Daniel Howie and Patricia St. Onge ("Defendants") **(Doc. 40)**.   Having reviewed the relevant pleadings and having considered the applicable law, the Court finds thatDefendants' motion is well-taken and, therefore, is GRANTED.

## BACKGROUND

Plaintiff W.K. on behalf of his minor child, A.K., filed this Complaint against Defendants alleging a deprivation of A.K.'s federal civil rights.  The underlying case began with Defendant Howie's investigation of allegations of child abuse of L.S., who turned out to be a four-year old female child, by her mother, T.P.  It was during the course of this investigation that Detective Howie became aware of Plaintiff and his six-year old son, A.K.  The following facts describe the incidents leading up to the "emergency hold" that was placed on Plaintiffs' son which resulted in the removal of A.K. from his father's custody for four days.  The complaint was filed in the

Second Judicial Court, County of Bernalillo on March 23, 2015 and removed by Defendants to federal court on May 15, 2015.

The complaint alleges several claims against two police officers of the Albuquerque Police Department: (1) unreasonable seizure under the Fourth Amendment (Count I), (2) violations of substantive and procedural due process under the Fourteenth Amendment (Count II), and (3) a violation of the right to familial association under the First Amendment (Count III). Defendants contend that they did not violate A.K.'s constitutional rights, and moreover, that Plaintiff cannot show that his rights were clearly established because Detective Howie's action in placing A.K. on emergency hold was supported by established law.

**I.      Facts**

The facts are undisputed unless otherwise noted, and for ease of narrative, the Court will generally omit references to supporting exhibits since they are available in the parties' briefs. The Court makes some general findings concerning the factual presentation by the parties. Plaintiff characterizes a large number of Defendants' facts as irrelevant to suspicions of abuse against his son, A.K. However, the Court finds that while many of these factual details may seem irrelevant initially, they are nevertheless critical to a determination of whether there was reasonable suspicion to place an emergency hold on the child because they are part and parcel of the officers' observations and information known to them prior to making the removal decision. For this reason, the Court includes most of these facts, but the Court will not include details that are not necessary either to the issues or helpful for context.

On April 6, 2014, APD received a call concerning an allegation of child abuse observed by a customer standing in line at the checkout at a Smith's grocery store on 4800 McMahon NW in Albuquerque, New Mexico.  The customer described the child as having several facial bruises

2

and the mother as being verbally abusive to the child.  Both mother and child were Caucasian.  A Smith's cashier also witnessed the occurrence.  Both individuals told the APD Police Officer Brown, who was dispatched to the Smith's that they saw several injuries to the child's face, which included bruises, scabs, broken blood vessels in her eyes and a black eye.  The two witnesses also said they noticed that the female child was missing hair.  The customer followed the mother and child after they paid and left the store and observed them enter a black four-door Ford vehicle with dark tinted windows.  The customer also observed the New Mexico license plate number.

    A.    <u>Locating T.P.</u>

Officer Brown received two messages from APD dispatch related to the incident.   The first message described a general welfare check, a city-wide be on the lookout ("BOLO") for a black Ford vehicle with a specific license plate number concerning allegations that a white female was hitting a child in the vehicle on March 12, 2014.  The second message described a welfare check from January 6, 2014 regarding an individual, T.P., who had been reported missing and was being harassed on Facebook.  The welfare check had been called in by a retired APD Commander who was a friend of T.P. and provided a specific apartment address on Indian School Road in Albuquerque, N.M.  T.P.'s daughter, L.S., was included in the welfare check.  Officer Brown requested APD dispatch to send officers to the Indian School NW *address* for T.P. and L.P. through the graveyard and day shifts.  The New Mexico license plate *number* came back registered to W.K., residing at an address on  Durham  *Street in Albuquerque.*  A check on this residence indicated it was vacant and the black Ford vehicle was not present.

Officer Brown  relayed  all  this  information  to  Detective  Howie  ("Det.  Howie"  or "Defendant Howie"), who was a detective with APD's Crimes Against Children Unit ("CACU")

and continued to update Detective Howie with information about the incident.   Det. Howie requested that Officer Brown contact him if he made contact with T.P. or her daughter L.S. during his shift and also requested that he make a report with Children, Youth and Families Department ("CYFD").

It took four days for the officers to locate T.P. and her daughter L.S.   On Monday, April 7, 2014, Det. Howie checked with APD dispatch and learned that graveyard and dayshift APD officers had checked T.P.'s apartment with no success. On the following day, April 8, 2014, he phoned CYFD investigator Brittany Torres and asked if there was any history of T.P. or L.S. Ms. Torres informed Det. Howie that there was an open case of neglect on L.S. with the last address being the Indian School address.   Neither Ms. Torres nor Det. Howie was able to make contact with T.P. at her apartment or by phone.   Det. Howie left a message for T.P. to call him back on one of the phone numbers.   He then contacted the manager of the apartment complex and was informed that T.P. had lived at the complex for over a year, but had recently moved to another apartment in the complex. The manager told Det. Howie that T.P. was a quiet tenant who paid her rent on time and that the staff had seen her when she paid her rent but otherwise she had not been seen around the complex.   Maintenance personnel working around the complex indicated to Det. Howie that they had not seen T.P. for the past two months.

On Thursday, April 10, 2014 around 8:00 a.m., Det. Howie checked various databases for other addresses linked to T.P and was able to locate three addresses.   He called the Albuquerque Public Schools ("APS") and learned that L.S. was not in the school system.   He met with no success in locating either T.P. or the black Ford at any of the three addresses linked to T.P. through the various databases.

When Det. Howie checked various databases for information on W.K., he discovered that W.K. had a six-year old child, A.K.  Det. Howie called APS and requested information on his school and the current address of his residence.  He learned that his current address was with his father, W.K. at an apartment on  Cibola Loop  in Albuquerque.

      B.      <u>Interactions with Plaintiff, A.K., T.P. and L.S. Leading Up to Emergency Hold</u>

In the afternoon of April 10, 2014, Det. Howie arrived at the  Cibola Loop apartment and observed a black Ford with tinted windows. Det. Howie then observed a white female with blond hair and a small juvenile female with blond hair exit the building.[1]  They were with a white male adult and male juvenile, all walking towards the Ford.  Det. Howie pulled his vehicle forward to contact them and explained that he was investigating a call of an injured child from the previous Sunday. The adult male was the Plaintiff, W.K, who told Det. Howie that he and his son, A.K. lived at this address, that the adult female, T.P. was his friend and that her and her daughter lived off of  Indian School Road.  Det. Howie recorded the interaction with his lapel cam.[2]

Det. Howie then spoke with the female child, L.S., who told him she was four years old. Although it was a warm, sunny day, L.S. was wearing sunglasses, a long sleeved shirt, long pants and a bulky white jacket.  After asking her to take off her sunglasses, Det. Howie observed a petechial hemorrhage in her right eye and that she was wearing skin-colored make-up on her whole face.[3]  He also observed the following injuries: (1) a golf-sized bump protruding from her forehead; (2) bruising on her forehead, camouflaged by the make-up; (3) bruising on her cheeks

---

[1]  Plaintiff disputes that he was exiting the building when Det. Howie approached, stating that he, T.P., L.S. and his son A.K. were all standing in the parking lot at the time.  Resp. to Fact 11.  This is the kind of immaterial non-response that the Court will omit from the factual narrative.

[2]  The Court has reviewed the CD's provided by Defendants which are video or audio CD's either from the officer's lapel cams or from recording devices during interviews that were taken.  In addition to the affidavits supplied by Defendants, these exhibits accurately support the facts they have presented.

[3]   These observations are taken from Det. Howie's affidavit, Doc. 40-1, ¶12.  A petechial hemorrhage is a capillary hemorrhage into the skin that forms minute hemorrhagic spots.  Stedmans Medical Dictionary 402380 & 675260.

camouflaged by the make-up; (4) small scratches on the left side of her face; (5) dried blood beneath her nose on her upper lip and in her nostrils; and (6) scratches with bruising underneath on her lower neck area.  Det. Howie also observed that L.S. had thin hair and thin appendages with a distended belly and did not appear to be thriving or physically healthy. Det. Howie asked L.S. how the blood on her nose occurred but had difficulty understanding her due to her difficulty in forming words.  Based on her clothing, Det. Howie was not sure if she had additional injuries that he could not observe.  He requested emergency medical personnel and an Albuquerque Ambulance responded.

Det. Howie then interviewed T.P., out of earshot of W.K. or L.S.  During the interview, T.P. told Det. Howie that they had been shopping at the Smith's on 4800 McMahon NW with L.S. that past Sunday. While they shopped, W.K. had sat outside in his vehicle, the black Ford, to give them a ride.  T.P. said that she lives at *the Indian School apartment*  but spends a lot of time with W.K.  T.P. said she had talked to Brittany today and was scheduled to see her on April 11, 2014.  T.P. then informed Det. Howie that L.S. had a small scratch on her back.

Albuquerque Ambulance personnel arrived and asked Det. Howie to come into the ambulance where L.S. was sitting.  L.S. was sitting with one of the ambulance personnel and was in her underwear.  She had bruises on her thighs.  L.S. stated that T.P. hit her on her legs with a belt and with her hand.  L.S. also had scabs on her lower back along the spine and multiple bruises on her upper buttocks.  Ambulance personnel advised Det. Howie that immediate medical attention was necessary and that they were going to transport L.S. to the University of New Mexico Hospital ("UNMH").

Det. Howie contacted T.P. again in the parking lot and advised her that L.S. would be transported to the hospital to check on her injuries and she agreed to meet him at the hospital. He

asked T.P. how she disciplines L.S., and T.P. told him that she yells at L.S. and has spanked her in the past, but no longer does so because it is ineffective.

Det. Howie contacted W.K. because W.K. wanted an explanation for the police activity. Det. Howie explained to W.K. that a report had been made on April 6, 2014 from the Smith's grocery store on 4800 McMahon NW due to a female juvenile with injuries. W.K. said that he had been there and waited in his vehicle for T.P. and L.S. to finish shopping. Det. Howie asked W.K. to drive T.P. and A.K. to UNMH and he agreed.  W.K. agreed to cooperate in the investigation.  When Det. Howie learned from dispatch that UNMH was not accepting patients, he advised W.K. to redirect to Presbyterian downtown on Central Ave.  Det. Howie arrived at Presbyterian hospital about 3:00 p.m. and met both T.P. and A.K. in the parking lot.  Both Ms. Torres and APD officer Patricia St. Onge also arrived at that time.[4]

Det. St. Onge, Det. Howie and Ms. Torres spoke with A.K. out of earshot of W.K. and T.P.  A.K. told Det. St. Onge, Det. Howie and Ms. Torres the following:  T.P. and L.S. spend the night at W.K.'s apartment regularly.  T.P. cooks meals for the four of them.   She spanks L.S. in the morning and at night when she does not listen.  Sometimes, T.P. presses L.S.'s face into the floor as a joke.   T.P. puts hot sauce in L.S.'s mouth to keep her from screaming at night. Id. W.K. puts A.K. in time out and spanks him on the buttocks with his pants on.  W.K. watches L.S. for T.P. and W.K. will put L.S. in time out or give her a second chance when T.P. is out. A.K. had stayed home from school for the past couple of days because he was sick.

Plaintiff "disputes" the facts based on the officers' conversation with A.K. and on Det. Howie's stated observations by denying there was any cohabitation between himself and T.P. or that they formed a family or common household.  He concedes that T.P. "occasionally" cooked meals for him and his son, but insists they had separate households.  Resp. to Fact 20.  Plaintiff

---

[4] Defendants have submitted affidavits of both Det. Howie and Det. St. Onge.  *See* Doc. 40, Exs. 1 & 2.

states that that L.S. had cystic fibrosis and that T.P.'s administration of treatment for the disease accounted for the scratches on L.S.' fact. *Id.* Plaintiff also denies that either he or A.K. witnessed any abuse of L.S. The Court does not find that Plaintiff's responsive statements create any material factual disputes to Defendants' facts, because none of these statements counter the information provided by A.K. to the officers. Plaintiff's interpretation or characterization of A.K.'s statements does not call into question any of A.K.'s statements or descriptions of what he observed. Moreover, Plaintiff's claim that neither he nor A.K. witnessed any abuse of L.S. cannot create an issue of fact regarding what A.K. witnessed or what A.K. stated that he witnessed because W.K. does not have personal knowledge of what A.K. observed or saw. *See Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir.1995) (facts asserted in affidavit or deposition testimony must be based on personal knowledge). Thus, while the Court must interpret the facts favorably to Plaintiff, Plaintiff does not provide any material factual issues on the facts Defendants have presented.

  C. <u>Emergency Hold Placed on A.K.</u>

  Based on the information Det. Howie had received from T.P., L.S. and A.K., and based on his training and experience, Det. Howie believed that there was an immediate threat to A.K.'s safety based on his home environment. In Det. Howie's training and experience, returning A.K. to the home could place him in danger of abuse, especially considering that the home and environment in which A.K. was staying had allowed the abuse of L.S. At the time, Det. Howie could not determine, based on A.K.'s statement that W.K. watches L.S. for T.P., whether W.K. himself had been involved in the abuse of L.S. Moreover, both parental figures in the home possibly participated in the abuse of L.S. and it was not clear yet whether A.K. had also been physically abused by one or both of the parental figures. What was clear to Det. Howie was that

A.K. had been exposed to abuse.  Also, based on Det. Howie's training and thirteen years of experience as a police officer and a detective with the CACU, and on Det. St. Onge's training and experience as well, A.K.'s having witnessed the abuse of L.S. constitutes abuse.  Det. Howie had also been taught that abuse can transfer from one child to another if an abused child is taken from the home, which was the reason for the common practice followed by both APD and CYFD, that when one child is taken from a home, all of the children are taken. This is done for the safety of the children and to remove them from an abusive environment.

Det. Howie placed A.K. on an emergency hold and A.K. was immediately taken into CYFD's custody. A.K. was removed from the hospital parking lot by Ms. Torres for placement.

During each of his encounters with A.K., A.K. was always within eyesight of his father, W.K.  In Det. Howie and Det. St. Onge's experience, A.K.'s father could influence the answers to the questions he was being asked.

C.     Facts Following Emergency Hold

The remaining facts (Facts 27-36) concern events and observations that occurred after A.K. was placed on emergency hold and removed from his father's custody.  Plaintiff contends that these facts are irrelevant to the question of whether there was reasonable suspicion for the removal decision.  The Court agrees that the appropriateness of Defendants' actions cannot be justified by facts that happened *after* the decision was made to place the emergency hold on A.K. The Court summarizes these facts here for context, although these facts will not have any bearing on the Court's rulings.

After A.K. was placed on emergency hold and W.K. left the hospital, Det. St. Onge and Det. Howie contacted L.S. in the emergency room.  L.S. was wearing a hospital gown and she agreed to allow Det. Howie and Det. St. Onge to look at her physical injuries. Det. Howie

arranged for a field investigator to come to the scene to photograph the injuries.  Det. Howie and Det. St. Onge observed the following physical injuries on L.S.: bruising and scratches on her forehead and both cheeks, a bloodshot right eye, dried blood on her nostrils and upper lip, red marks on her left ear, multiple scabs along her spine, multiple bruises on her buttocks and bruising on the circumference of both thighs.

Det. Howie and Det. St. Onge also interviewed T.P., L.S. and A.K. and learned more information about T.P. punished L.S., and about the relationship between T.P. and W.K.  T.P. told the officers that she spent on average two weeks a month at W.K.'s apartment, that she had been living there for the last three weeks and that was there on the night before the Smith's incident.  Sometimes T.P. sometimes slept with her daughter L.S. in the living room of W.K's apartment while W.K and AK slept in WK's room.  She described her relationship with W.K. as being "friends with benefits." T.P. stated that both parents felt close to the other parent's child and that they had an agreement that they would not discipline each other's children.

Following the investigation, Det. Howie submitted the case to the Bernalillo county District Attorney's Office for review and possible prosecution.[5]  Then, on April 14, 2014, A.K. was returned to W.K. by CYFD, following a meeting W.K. had at CYFD.

Plaintiff has presented twelve additional material facts, only six of which are based on supporting evidence. *See* Doc. 63 at 7-8, Add'l Facts 32, 33, 35, 36, 38 and 41.  The other additional facts are unsuitable for summary judgment purposes.  Additional Facts 29-31 reflect counsel's arguments concerning what Defendants' facts do not show, such as Plaintiff's statement that "[n]othing in Defendant's Statement of Facts ever alleged abuse or reasonable suspicion of abuse of A.K."  Other additional facts (38, 41) are statements referring to APD standard operating procedures ("SOP") concerning referrals to CYFD and placements of children

---

[5]   There is no information about whether or not he case was prosecuted.

removed from homes.  Plaintiff may not rely on SOP's as a means to establish or prove a constitutional violation and will not be considered here.  *See Tanberg v. Sholtis,* 401 F.3d 1151, 1163-64 (10th Cir. 2005) (violation of SOP not relevant to constitutionality of officer's actions in excessive force case, and not admissible evidence); *see also Marquez v. City of Albuquerque*, 399 F.3d 1216 (10th Cir.2005) (noting that Tenth Circuit has "consistently held that the violation of police regulations is insufficient to ground a §1983 action for excessive force").

While several of Plaintiff's additional facts refer to evidence attached to the response, they are based on either Plaintiff's affidavit or the affidavit of his ex-wife Nicole Maas, who is A.K.'s mother.  The Court will not consider Ms. Maas' affidavit because Ms. Maas was not present during any of the times during which Det. Howie was developing reasonable suspicion that A.K. was in danger.  Statements in her affidavit, such as those concerning W.K.'s inquiry into whether CYFD would release A.K. into Ms. Maas' custody, concern her contact with CYFD and are immaterial to the issue of whether the emergency hold of A.K. by Det. Howie was based on reasonable suspicion.  *See* Doc. 63 at 25, ¶9.  Plaintiff's own affidavit is also deficient because many of the statements in W.K.'s affidavit are not based on personal knowledge or do not present any facts which dispute those presented by Defendant.  For example, W.K. states in his affidavit that he and T.P. "made it very clear to APD Detectives Howie and St. Onge that there was no cohabitation and or [sic] familial connection."  Doc. 63 at 19, ¶6.  Plaintiff's characterizations of his intent behind his conversations with the officers do not rebut the actual statements and information given by T.P. herself to Det. Howie.

As a result, Plaintiff has presented no facts to dispute the facts presented by Defendant and the Court's inquiry turns to whether Defendants are entitled to qualified immunity or summary judgment as a matter of law based on those facts.

## II.      Legal Standard

Defendants have asserted the defense of qualified immunity, which shields government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Romero v. Story*, 672 F.3d 880 (10th Cir. 2012). For a right to be clearly established there must be Tenth Circuit or Supreme Court precedent close enough on point to make the unlawfulness of the officers' actions apparent.  *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir.2010).   Defendants' assertion of the qualified immunity defense requires Plaintiffs to bear the burden of demonstrating that (1) Defendants violated a constitutional right and (2) the constitutional right was clearly established at the time of the alleged conduct.  *Reeves v. Churchich*, 484 F.3d 1244, 1250 (10th Cir.2007).  If Plaintiffs meet this burden, Defendants may still prevail by satisfying the usual summary judgment standard of showing that no material facts are in dispute and that he or she is entitled to judgment as a matter of law.  *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002).   The Court must construe these facts in favor of the nonmovant.  *Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373, 1377 (10th Cir. 1980).

### DISCUSSION

Defendants contend that Det. Howie had reasonable suspicion to believe that there was an immediate threat to A.K.'s safety, that it was appropriate to remove A.K. from W.K.'s and T.P.'s care on an emergency hold basis, and that there was no violation of any clearly established right committed by either Det. Howie or Det. St. Onge.

## I.      Clearly Established Law

The United States Supreme Court has left for the district court to decide which of the two prongs should be addressed first in the qualified immunity analysis in light of the circumstances in the particular case. *Pearson v. Callahan*, 555 U.S. 223, 226 (2009). The Court finds it more efficient to first address the question of whether the law concerning removal of a child from the custody of his parents was clearly established at the time of the underlying incident. If so, and Defendants are found to have acted reasonably under that law, then there is no need to address the second qualified immunity prong because even assuming Plaintiff has alleged a viable constitutional claim, Defendants would be entitled to qualified immunity.

When it comes to deciding the qualified immunity question regarding clearly established law, it is "not enough to look at, and declare a law enforcement officer liable, based on such generalized principles." *Medina v. City and County of Denver*, 960 F.2d 1493, 1497-98 (10th Cir. 1992). The United States Constitution recognizes familial association as a fundamental right, but not every act that results in an interference with the right of intimate association is actionable. *Griffin v. Strong,* 983 F.2d 1544, 1548 (10th Cir. 1993); *see also Gomes v. Wood*, 451 F.3d 1122, 1129 (10th Cir. 2006) (the interest of the child in being removed from that home setting to a safe and neutral environment outweighs the parents' private interest in familial integrity as a matter of law") (citing *Thomason v. SCAN Volunteer Servs., Inc.,* 85 F.3d 1365, 1373 (8th Cir.1996)).

The Tenth Circuit has adopted a "reasonable suspicion" standard for determining whether emergency circumstances justified the removal of a child from a home. Under this standard, officials must have "evidence giving rise to a reasonable and articulable suspicion that the child has been abused or is in imminent peril of abuse." *See Gomes v. Wood,* 451 F.3d at 1129. [I]n emergency circumstances which pose an immediate threat to the safety of a child, officials may

temporarily deprive a parent of custody without parental consent or a court order." *Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir. 1997). "Emergency circumstances" have been defined as 'instances in which the child is immediately threatened with harm, for example, where there exists an immediate threat to the safety of the child, or where the child is left bereft of care and supervision, or where there is evidence of serious ongoing abuse and the officials have reason to fear imminent recurrence." *Taylor v. Evans*, 72 F.Supp.2d 298, 307 (S.D.N.Y. 1999) (citing *Hurlman v. Rice*, 927 F.2d 74, 79 (2d Cir. 1991). The important question is whether the circumstances rise to the level of emergency proportions. See *Taylor*, 72 F.Supp.2d at 307.

Defendants cite to a Tenth Circuit case, *Arredondo v. Locklear,* as factually similar to the instant case.  462 F.3d 1292 (10th Cir. 2006).  In the *Arredondo* case, plaintiffs had two children, Ashley who was five years old, and Jasmine who was an 11-month old infant.  The children's mother brought the infant to the emergency room reporting that the child was having difficulty crawling and an x-ray revealed a fracture in her left arm.  The doctor felt that the mother's explanations for the injuries were inconsistent and made a referral to CYFD.  CYFD visited the home, examining the bed from which the infant had fallen and found it implausible that the injuries Jasmine had presented with at the hospital resulted from a short fall onto thick carpet. CYFD made the decision to remove Jasmine from the home, as well as five-year old Ashley. The investigator based this decision on his training where he learned that abuse can shift to other children in a home when a child in harm's way is removed. Although another CYFD worker disagreed with this decision, as a result of a subsequent staff meeting involving CYFD, Ashley was ultimately removed from the home as well based on a "targeted child" or "scapegoat"

14

theory.[6]   The *Arredondo* court held that there was no genuine issue of material fact that the police and social workers had "reasonable and articulable suspicion that the older child was in imminent peril." *Id.* at 1299.

In its analysis in *Arredondo,* the Tenth Circuit cited to *Taylor v. Evans,* 72 F.Supp.2d 298, 307 (S.D.N.Y. 1999), where natural children of foster parents (the Taylors) were removed following evidence of abuse of the foster child.  The foster child had been born with severe and multiple handicaps.  The hospital providing the child's treatment believed that his healthcare was too complicated for a foster parent to handle alone, and filed a report with Child Welfare Administration ("CWA") when total body x-rays indicated multiple fractures in various stages of healing, which was indicative of child abuse.  A CWA caseworker visited the Taylor home.  The home was neat and adequately furnished and the children appeared to be clean, well behaved and in good health.  No injuries were observed.  *Id.* at 302-03.  Nevertheless, the caseworker decided that based on the foster child's serious and unexplained injuries, it was necessary to remove the other children from the home.  *Id.*  The *Taylor* court found the caseworker's assessment to be an objectively reasonable one, in light of the serious injuries sustained by a child under Taylor's care, the absence of a consistent explanation to explain those injuries, and the existence of an unbiased, specific report citing fear of child abuse.  *Id.* at 309.  The court also emphasized that "analysis is not undertaken in hindsight but is determined by examining the defendants' actions in the content of the circumstances with which they were confronted." *Id.*

The objective legal reasonableness of Det. Howie's actions also takes into account any relevant state statutes, regulations or official policy that has explicitly sanctioned the conduct in question.  *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1251 (10th Cir. 2003).  In this case,

---

[6]  Under the "scapegoat" or "targeted child" theory, there is a danger that abuse may shift to another child in the household once an abused child is removed, and for this reason all of the children are removed.  *See* 462 F.3d at 1301-02.

there is a state statute that also allows a law enforcement officer to take a child into protective

custody when he or she:

> has evidence giving rise to **reasonable ground** to believe that the child is abused
> or neglected and that there is an immediate threat to the child's safety; provided
> that the law enforcement officer contacts the department to enable the department
> to conduct an on-site safety assessment to determine whether it is appropriate to
> take the child into immediate custody[.]

NMSA 32A-4-6(A) (emphasis added).  An "abused child" includes a child "(1) who has suffered

physical abuse **or who is at risk of serious harm** because of the action or inaction of the child's

parent, guardian or custodian; (2) "who has suffered physical abuse, emotional abuse or

psychological abuse inflicted or caused by the child's parent, guardian or custodian; . . . (4)

whose parent, guardian or custodian has knowingly, intentionally or negligently placed the child

in a situation that may endanger the child's life or health[.]"  NMSA§ 32A-4-2(B) (emphasis

added). The phrase "serious harm" is not defined in the statute.

Once a child has been taken into custody, the police officer must act with "all reasonable

speed" to deliver the child to CYFD or to a shelter facility or to a medical facility depending on

the circumstances.  *See* NMSA §32A-4-7(A)(1)-(2).  The statute also requires CYFD's

participation in the decision to remove a child.  Section 32A-4-7(B) states that "[w]hen an

alleged neglected or abused child is delivered to [CYFD], a [CYFD] caseworker shall review the

need for placing the child in custody and shall release the child from custody unless custody is

appropriate or has been ordered by the court."  This "need" for removal from custody is similar

in nature to the "reasonable suspicion" standard adopted by the Tenth Circuit in *Gomes v. Woo*d,

451 F.2d. at 1129.

Plaintiff asserts his claims as violations of A.K.'s rights under the First Amendment,

Fourth Amendment and Fourteenth Amendment due process clause.  Both parties present the

same argument to address all of these claims, although the Tenth Circuit has treated claims

which assert violations of the familial right of association as more properly brought under the Fourteenth Amendment substantive due process clause. *See Griffin v. Strong,* 983 F.2d at 1547 (concluding that the familial right of association "is properly based on the 'concept of liberty in the Fourteenth Amendment"; *see also J.B. v. Washington County*, 127 F.3d 919, 927 (10th Cir. 1997) (noting that plaintiffs' right of familial association "is included in the substantive due process right of freedom of intimate association" and "is based on the Fourteenth Amendment liberty interest"). A balancing test used to determine whether a plaintiff's right to familial association has been infringed, the court must balance the individual's interest in liberty against the State's asserted reasons for restraining individual liberty. *J.B. v. Washington Cty.,* 127 F.3d at 927; *Lowery v. Cty of Riley,* 522 F.3d 1086, 1092 (10th Cir. 2008).

Plaintiff asserts his Fourth Amendment claim of unreasonable seizure based on the absence of probable cause to believe that A.K. was being abused or neglected. Doc. 1-1, ¶43. Based on the Tenth Circuit's pronouncement of familial right claims as belonging under Fourteenth Amendment protection, the Court questions whether this case is appropriately alleged as a Fourth Amendment case. Probable cause is not the relevant standard for removal of a child from the home into CYFD custody, nor was A.K. arrested which would have involved a separate analysis under the probable cause Fourth Amendment standard. In any event, all of Plaintiff's claims would be analyzed under a reasonable suspicion standard, except for Plaintiff's procedural due process claims which will be addressed separately. This reasonable suspicion standard was the clearly established law at the time Det. Howie placed an emergency hold on A.K. and removed him from W.K.'s custody.

## II.     Whether Defendants are Entitled to Qualified Immunity

Defendants are entitled to qualified immunity if the facts developed prior to placing A.K. in an "emergency hold" constituted reasonable suspicion.  Plaintiffs also claim that his due process rights were violated because of Defendants' failure to provide him with a hearing either before or after A.K. was removed from his custody.

A.    Emergency Hold and Removal

In this case, the undisputed facts support Det. Howie's decision that there was reasonable suspicion to believe that A.K. was at risk for abuse if he was not removed from W.K.'s custody. Whether A.K. was in fact at risk of being abused is not the question here, but rather whether the facts leading up to placing A.K. on emergency hold justify Det. Howie's decision to take that action.

Det. Howie was informed that a caller from Smith's had witnessed child abuse at the store, and W.K., A.K., P.P. and L.S. were together at the store on April 6, 2014.  They were together in W.K.'s vehicle on March 12, 2014 which had also been called into APD because a caller had described a white female hitting a child.  This individual, who turned out to be T.P., was found walking out of W.K.'s apartment in the complex parking lot, together with W.K., A.K., and L.S.

Det. Howie observed physical signs of abuse on L.S., which were observed more closely when L.S. was examined in the ambulance.  Based on his conversation with T.P., he learned that T.P. spends a lot of time with W.K.; that she was not staying in her apartment and had not been there for about two months, other than to pay her rent. Det. Howie also learned from A.K. that T.P. spent the night at W.K.'s apartment regularly and that TP would cook meals for the four of them.  AK also related that T.P. would spank L.S. in the morning and at night when she would not listen, would press L.S.'s face into the floor as a joke and would put hot sauce in L.S.'s

mouth to keep her from screaming at night.  A.K. also stated that W.K. would sometimes watch L.S. Through these conversations, Det. Howie came to the conclusion that L.S. was being abused, and this conclusion was reasonable for him to make.  Based on A.K.'s statement to Det. Howie that W.K. sometimes took care of L.S., it was not clear whether A.K. was in fact being abused, nor was it clear who the abuser was.   All of this information, including a lack of uncertainty as to the identity of the abuser gave Det. Howie concern as to A.K.'s immediate safety in his home environment, and the Court finds that this concern was based on reasonable suspicion.

Under a Fourteenth Amendment framework for familial association claims, the Court must consider whether A.K.'s interest in liberty (which under this set of facts means remaining in his then-current home situation) outweighs the state's reasons for restraining that liberty by placing an emergency hold on A.K. and removing him from W.K.'s custody.   The Court concludes it does not.  Here, the state's interest in ensuring A.K.'s safety was paramount in light of facts indicating abuse to L.S.; the risk of abuse to A.K. who shared the same home environment regularly enough to warrant concern over his safety; and the uncertainty about the identity of the abuser or abusers.   In addition, the officers complied with the requirements of NMSA §32A-4-6(A) in calling upon Ms. Torres and the CYFD for an assessment of the situation in order to determine whether it was appropriate to take A.K. into immediate custody. Therefore, placing an emergency hold on A.K., and removing him from his father's custody did not violate A.K.'s constitutional rights. Plaintiff objects to Det. Howie's conclusion that W.K. and T.P. cohabitated and formed a family or parental unit, but he fails to present facts which sufficiently rebut the reasonableness of that conclusion. Based on the information given to Det. Howie by both T.P. and A.K., and which remains undisputed, Det. Howie knew enough about

the visiting habits and living arrangements to reasonably conclude that A.K. could be at risk for abuse in his home environment.

Det. St. Onge, who arrived on the scene at the hospital, and also spoke to A.K., also came to the same conclusions as did Det. Howie.  While she was unclear as to whether A.K. himself had been abused, she believed that there was an immediate threat to A.K.'s safety based on his home environment and on T.P.'s involvement with W.K. and A.K.  All of the information possessed by both Defendants prior to the placement of an emergency hold on A.K. can be considered as a justification for the conclusions made by these Defendants.

Plaintiff also rebuffs the "scapegoat" or "target child" theory, noting the skepticism expressed by the Tenth Circuit in *Arredondo v. Locklear*, which the Court discussed above. However, *Arredondo* turns out to be more similar to the facts in the instant case than it is distinguishable, as Plaintiffs would argue.  In *Arredondo,* the court acknowledged the existence of studies which presented concerns of abuse in families in which another sibling has been previously abused. 462 F.3d at 1301.  It did offer some skepticism regarding the reliability of the "targeted child" theory and noted that "correlation and causation are two different things."  For example, these studies offered no information about the immediacy of the identified threat, nor did they offer any information about exceptions to the theory.  *Id.*  Yet, despite its cautious approach to the "target child" theory, the Tenth Circuit did not reject it and expressly refrained from making any "general pronouncements" about its reliability. *Id.* at 1302.  In the end, the Tenth Circuit affirmed the district court's finding that the removal decision was based on reasonable suspicion "after careful consideration of the facts of the case," and it noted that state officials "routinely remove all of the children from a home when they harbor reasonable suspicions of abuse of any one child."  462 F.3d at 1302.

A large part of the Tenth Circuit's tentative approach to the "targeted child" theory in *Arredondo* was due to the fact that the parties in that case "provided [the court] with precious little information about it." 462 F.3d at 1301.   What is important to take away from the case is that the court's holding did not rely on the "target child" or "scapegoat" theory, but rested on findings that defendants had "reasonable and articulable suspicion" that the older child "was in imminent peril of abuse. *Id.* at 1302. The instant case calls for the same approach.   The inquiry is not so much whether the "target child" theory is a viable or reliable theory, but rather whether Det. Howie had reasonable suspicion to believe that there was an immediate threat to A.K.'s safety based on him home environment.   Based on the facts described above, it is clear that Defendants' actions in placing an emergency hold on A.K. and removing him from his home did not violate A.K.'s constitutional rights under clearly established law that existed at the time of the underlying incidents.

     B.    <u>Due Process</u>

Under the Fourteenth Amendment to the United States Constitution, parents have a protected liberty interest in the care, custody and control of their children." *Gomes*, 451 F.3d at 1127 (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). As a result, state officials may not remove children from the home, through either temporary seizures or the permanent termination of parental rights, without providing due process of law." *Gomes*, 451 F.3d at 1128.

Ordinarily, due process requires that the state provide parents with a predeprivation notice and a hearing—that is, "notice and an opportunity to be heard before state officials remove children from the home." *Arredondo*, 462 F.3d at 1298 (citing *Hollingsworth v. Hill*, 110 F.3d 733, 739 (10th Cir. 1997). However, because of the state's "powerful countervailing interest in protecting children from abuse and neglect , . . . extraordinary circumstances may

21

justify the state in 'postponing the hearing until after the event.'" *Id.,* 462 F.3d at 1298 (citing *Spielman v. Hildebrand*, 873 F.2d 1377, 1385 (10th Cir. 1989 (quoting *Smith v. Org. of Foster Families for Equality and Reform*, 431 U.S. 816, 848 (1977)). Thus, when faced with "emergency circumstances which pose an immediate threat to the safety of a child," the state may "temporarily deprive a parent of custody without parental consent or a court order." *Hollingsworth*, 110 F.3d at 739. Such circumstances occurred here. Because Det. Howie had reasonable suspicion to believe that there was an immediate threat to A.K.'s safety, he was therefore entitled to remove A.K. from T.P. and W.K.'s home without notice or a hearing.

Plaintiff also asserts that the state must act promptly to provide a post-removal hearing, referring to cases from the Eighth, Seventh, Ninth and Fourth Circuit cases rather than any controlling law in New Mexico. Supreme Court precedent makes clear that a state actor's random and unauthorized deprivation of procedural due process cannot be challenged under 42 U.S.C. § 1983 so long as the state provides an adequate post-deprivation remedy. *Albright v. Oliver*, 510 U.S. 266, 283 (1994)(citing *Parratt v. Taylor*, 451 U.S. 527 (1981)). The problem in this case is that Plaintiff conflates the obligations of a *state* with those of the two individuals being sued in this case. Here, A.K. was placed on emergency hold by Det. Howie and Det. St. Onge, and ultimately delivered to CYFD's custody, pursuant to state statute. *See* Section 32A-4-7(A)(1)-(2). CYFD returned A.K. to W.K.'s custody four days later following a meeting between CYFD and W.K. Under these facts and the requirements of the relevant state statute, it is clear that if there was any post-deprivation process due to A.K. or W.K., it was an obligation of the state (or CYFD), and not Det. Howie, Det. St. Onge or any APD police officer, for that matter. In other words, the law was not clearly established that either officer was required to provide any kind of hearing to A.K. before or after the removal decision. In fact, the law is clear

on defining the *state,* rather than police officers, as being responsible for providing any hearing prior to deprivation of a property right. Therefore, Defendants are entitled to both qualified immunity and summary judgment on Plaintiff's procedural due process claim.

## CONCLUSION

In sum, the Court finds and concludes that Defendants are entitled to qualified immunity on Plaintiff's claims brought under the Fourteenth Amendment substantive due process (Count II), and the First Amendment right to familial association (Count III). Defendants' actions in placing an emergency hold on A.K. and removing him from his home did not violate A.K.'s constitutional rights under clearly established law that existed at the time of the underlying incidents.

The Court also finds and concludes that Defendants are entitled to summary judgment on Plaintiff's Fourth Amendment claim (Count I). Defendants have moved for summary judgment on this claim but include discussion on this claim within their general argument under the reasonable suspicion standard that governs the issues in this case.

Finally, the Court finds and concludes that Defendants are entitled to qualified immunity on Plaintiff's procedural due process claim in Count II. The same circumstances that justified an emergency hold being placed on A.K. are the same "extraordinary circumstances" that justified the state in postponing the hearing until after the event. Further, once A.K. was in the custody of CYFD, it is the *state*, rather than the named Defendants in this case who would have been required to provide a post-deprivation hearing if such a hearing was mandatory at that point. Therefore, Plaintiff's procedural due process claim fails as a matter of law against these Defendants.

**THEREFORE,**

**IT IS ORDERED** that Defendants' Motion for Summary Judgment Based on Qualified Immunity **(Doc. 40)** is hereby GRANTED for reasons described above.

A final Judgment shall issue separately pursuant to Fed.R.Civ.P.58.


_____
UNITED STATES DISTRICT JUDGE